# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KENNETH E. KING,

        Petitioner,

    v.                                     Case No. 05-C-928

GREG GRAMS, Warden,
Columbia Correctional Institution,

        Respondent.

## DECISION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

### I. BACKGROUND

The petitioner, Kenneth E. King ("King"), commenced this action by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in the Milwaukee County Circuit Court. On September 9, 2003, after a jury trial, King was convicted of Robbery with the Threat of Force, contrary to Wis. Stats. § 943.32(1)(b), and was sentenced to fifteen years imprisonment followed by ten years supervised release. Against King's wishes, King's appellate counsel filed a post-conviction motion raising certain issues in the circuit court, and then filed a "no merit brief" in the Wisconsin Court of Appeals. King filed his own response to his attorney's no merit brief. On March 11, 2005, the court of appeals affirmed King's conviction. On July 28, 2005, the Wisconsin Supreme Court denied King's petition for review. King did not petition the United States Supreme Court for a writ of certiorari.

On August 30, 2005, King filed his petition in this court. In accordance with this court's briefing schedule, the parties have briefed their respective positions on the issues raised in King's

petition and this matter is now ready for resolution.  For the reasons which follow, King's petition for writ of habeas corpus will be denied.

## II.  FACTS

The evidence presented at King's trial was summarized by the Wisconsin Court of Appeals as follows:

> Yolonda Billingsly testified that she was returning home on July 30, 2002, after attending a night class at UWM.  The class ended at 9:00 p.m., and the bus ride home lasted about one hour.  The bus stop was two blocks from her house.  As she was walking to her house, a man walked toward her and stopped in front of her.  The man said he had a gun and told Billingsley to give him her money.  The man had his right hand behind his back and Billingsly believed he had a gun.  She gave him three dollars.  The man then asked for her watch and necklace, and Billinglsley gave them to him.  Billingsley complied with the man's request because she was scared and he said he had a gun.  When a woman and child approached, the man told Billingsley to act like they were together, and he put his arm around her waist.  As the woman passed, Billingsley told the woman she was being robbed, but the woman continued walking.  Billingsley then stopped and asked for her things back.  The man nudged her to keep going, and when she refused, he walked away.  Billingsley continued to her house and contacted the police.

> Billingsley testified that there was a street light two or three houses from where the man stopped her, and that he had "walked through" the light so that she saw him "clearly."  They were "face-to-face" for approximately two to three minutes.  Billingsley also testified that the man smelled of liquor.

> Billingsley gave the responding officer a description of her assailant.  Later that night, police took Billingsley to view a person who fit the description.  Billingsley identified King.  Billingsley testified that King "had the exact same clothes on that the guy who robbed me, and he was tall and kind of stockier build just like the guy who robbed me."  Billingsley testified that there was "no doubt" in her mind that King was the robber.  She identified Exhibits 1 and 2 as containing a shirt and shorts that looked like the clothes that King was wearing during the robbery.  On cross-examination, Billingsley testified that she told police that the suspect's shirt had "light blue writing" on it, and she acknowledged that the shirt in Exhibit 1 did not have any such writing.

> Police Officer Joan Mueller was dispatched to Billingsley's house at 10:44 p.m.  Billingsley described her assailant to Officer Mueller as an African-American

2

male, between forty and fifty years old, five-foot ten-inches tall, weighing about 180 pounds, medium build, bald and with "stubble on his face." Office Mueller testified that King was an African-American male, forty-one years old, five foot nine-inches tall, and weighed 170 pounds when arrested. Billingsley told Officer Mueller that the robber was wearing a "dingy white t-shirt with some kind of writing on the front of it and either dark colored shorts or pants." Officer Mueller radioed the description to the other officers who were searching the area for a suspect.

Officer Clarence Pratt was patrolling the area in a marked squad car when he heard the broadcasted description. Officer Pratt soon saw a person matching the description "jogging" across Teutonia Avenue. He watched the suspect "dash[]" into an alley and "secret[] himself on the side of a garage." The squad stopped about twenty feet from the suspect. When Officer Pratt exited the squad, he yelled, "Police, stop." The suspect started running northbound through several rear yards, "hopping" fences as he fled. Officer Pratt pursued while other officers set up a perimeter. Officer Pratt saw the man get up from a pile of debris in an alley and walk onto the front porch of the house at 4954 North 28th Street. Police apprehended the man at 11:40 p.m. He was "sweating profusely" and smelled of alcohol. The residents of the house where the man had stopped told police that they did not know him. When apprehended, the man did not have any money, watch, necklace, or weapon on his person.

Detective Tracy Becker was with Billinglsey when he received a report that a suspect had been apprehended. Billingsley lived less than two blocks from where the man had been apprehended. Detective Becker testified that he told Billingsley that police had found a man who matched the general description in the general area of the robbery. He told Billingsley that he may or may not be the perpetrator, police did not know, and he asked her to look at the man. Billinglsey was seated in a squad car and the suspect was standing, uncuffed, outside another car. Detective Becker testified that when the suspect first came into view, from about 100 feet away, Billingsley "took one look at him and said: That's him. That's him." Detective Becker told her to make sure. When they got closer and it was better-lighted, Billingsley told the detective she was "100% positive" that the suspect was the man who had robbed her. Detective Becker testified that Exhibits 1 and 2 contained the clothing that King was wearing when he was arrested.

King's theory of defense was misidentification. He also presented an alibi defense through the testimony of Bridgette Parker, his girlfriend, and Helen King, his mother. Ms. Parker testified that she lived with King, their child, and his mother at 4952 North 25th Street. On July 30, 2002, she and King were together in their basement room when King went upstairs "right before Seinfeld" came on television, about 10:30 p.m. King did not say he was leaving the house but he was not dressed

Case 2:05-cv-00928-WEC   Filed 06/02/06   Page 3 of 32   Document 21

for bed. She denied telling a detective that King had left, returned and then left again that night.

Mrs. King testified that King left the house at 10:42 p.m. She testified that she often took notes detailing her son's conduct, and she had written the time he left that night in a notebook. In rebuttal, Detective Becker testified that Mrs. King did not tell him that King left the house at 10:42 p.m., but rather that King had come into the kitchen from the basement at that time.

(Answer, Ex. D at 3-6.)

### III. STANDARD OF REVIEW

Federal courts may issue a writ of habeas corpus for a person in custody pursuant to the judgment of a state court "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Furthermore, federal courts may not grant habeas relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" federal law as determined by the Supreme Court if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision results in an "unreasonable application" of clearly established federal law when the state court either (1) "identifies the correct governing legal rule from [Supreme Court precedent] but unreasonably applies

4

it to the facts of the particular state prisoner's case," or (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*. at 407; *see also Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004). Moreover, "[a] rule is 'clearly established' only if it is compelled by existing Supreme Court precedent." *Henry v. Page*, 223 F.3d 477, 480 (7th Cir. 2000).

## IV. DISCUSSION

In his petition and brief in support thereof, King alleges a plethora of errors and instances of improper conduct on the part of his counsel, the trial court judge, the prosecutor at his trial, the Wisconsin Court of Appeals, and others. King's arguments can be grouped into the following alleged grounds for habeas relief: (1) the trial court judge and one of the jurors were biased against King; (2) prosecutorial misconduct; (3) ineffective assistance of trial counsel; (4) ineffective assistance of appellate counsel.

### A. Bias on the Part of the Trial Court Judge and One Juror

King argues that he was not provided a fair trial because the trial court judge and one of the jurors at his trial were biased against him. King offers a number of occurrences at voir dire and trial which he argues demonstrate that the judge was biased. First, King points to the fact that the judge admonished the jury not to do any internet searches regarding the case. King contends that by telling the jury not to do internet searches to find out background information about the defendant or the victim in the case on sites like "Google," the judge created the impression that King did in fact have a criminal background to search for. (Pet'r's Br. at 2.)

Second, King points to the fact that the trial judge told the jury not to go to the scene of the crime at the alleged time of the crime, and then said, "[l]et's assume it happened at nine o'clock at

5

night. I have no idea. You're not to go there at nine o'clock and check out the lighting system yourself." (Tr. at 54.)[1] King argues that because the time the judge suggested, nine o'clock, was the same time that the prosecutor ultimately argued that King committed the crime, this shows that the judge and the prosecutor were in collusion. Moreover, King argues that by commenting on the lighting and time of night during voir dire, before evidence concerning those matters was presented to the jury, the judge was "subtly" prejudicing the jury against King. (Pet'r's Br. at 4-6.)

Third, King maintains that by commenting to the jury at voir dire that the trial was going to be short, rather than a week or two weeks as some trials are, the judge suggested to the jury that the trial should be "'short and quick' at the expense of being 'reasoned and well-thought out,'" and thus suggested to the jury that his (the judge's) mind was already made up concerning King's guilt. (Pet'r's Br. at 6.)

Next, King claims that the judge's interchange with one of the jurors demonstrated a bias against King. Juror #2 stated that she worked as a legal assistant for a law firm and the trial judge stated that he knew the lawyer who was her employer "very well." (Tr. at 13.) Later, when the prosecutor asked juror #2 a question about the practice of the law firm she works for, the judge stated "[l]et me interrupt. I know – let me interrupt. I know Mr. McQuire [sic] very well, and he's never been in a felony court as far as I know – in his life, possibly. He specializes just in family and children's court, maybe occasional misdemeanors. Sorry to answer the question for the juror. You may know the answer better." (Tr. at 32.)

---

[1] The transcripts for King's trial, verdict, and sentencing are marked Respondent's Exhibits H, I, and J. For ease, this court will simply cite to the transcript page number.

King also argues that juror #2 evaded a question about whether she had any police relatives and the judge allowed her to do so. Moreover, King contends that juror #2 was herself biased against him. When asked if anyone was caught when her home was burglarized many years ago, juror #2 answered "No. No, there never is." (Tr. at 15.) In short, King argues that juror #2 should have been struck for cause based on her answer and on the judge's friendship with her boss, and that the judge's failure to do so as well as his other interactions with juror #2 demonstrate that the judge was biased against King.

The "Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citation omitted). However, due process does not require that a judge recuse him or her self based on vague or generalized allegations of bias. *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986) (holding that "general hostility towards insurance companies" by the trial judge does not violate due process. "Certainly only in the most extreme of cases would disqualification on this basis be constitutionally required."). A situation where it is more likely that due process is violated is where a judge has a personal interest in the matter at hand. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 813-15 (2002); *Bracy*, 520 U.S. at 905.

Furthermore, "[o]ne touchstone of a fair trial is an impartial trier of fact-'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). When a claimed due process violation is based on a juror's failure to answer questions during voir dire, the defendant "must first demonstrate that a juror failed to answer honestly a material question on voir

dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556.

The Wisconsin Court of Appeals determined that King's claim that the trial court and a juror were biased against him lacked merit. The court reviewed the voir dire transcript and found "no hint of bias or partiality" on the part of juror #2, and that there would have been no basis for a motion to strike that juror for cause. Moreover, the court found nothing wrong with the way the trial judge handled the jurors during voir dire. (Answer, Ex. D. at 11-12.)

I cannot say that the court of appeals' determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Nor was the court's decision "based on an unreasonable determination of the facts." The inferences of judicial bias that King would have this court draw from the trial judge's instructions to the jurors regarding the internet, visiting the scene of the crime, and the expected length of the trial, as well as his interactions with juror #2, were clearly rejected by the court of appeals. Doing so was not unreasonable. To put it mildly, the inferences of bias that King suggests are highly attenuated.

Moreover, nothing about the trial judge's acquaintance with juror #2's employer suggests that King did not get a fair trial. Even if the judge was closely aquainted with the juror's employer, I fail to see how this demonstrates a bias against King by either the juror or the judge. Nor does the fact that juror #2 voiced a sentiment, that in her opinion the perpetrators of crimes are not often caught by police, suggest that the juror was not "capable and willing to decide the case solely on the evidence before [her]." The same juror stated that she would be able to listen to the judge's

8

instructions and that there was nothing about her experience that would cause her any problems with the "criminal system in general," or make her unable to sit on the jury. (Tr. at 33-34.)

Finally, King's argument regarding juror #2 allegedly evading a question about whether she had any police relatives without merit. In order to show a deprivation of due process, King would have to demonstrate that the juror "failed to answer honestly a material question on voir dire," and that "a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. King can do neither. The line of questioning that King complains of went as follows:

> THE COURT: [do you have any] Friends or relatives who are police officers?
>
> [JUROR #2]: I know some, yes, but - -
>
> THE COURT: Do you have any close friends or relatives?
>
> [JUROR #2]: Not close friends.

(Tr. at 14.) The court then went on to explain in greater detail what constitutes "close friends," and the questioning moved on to other matters. The most natural reading of the above exchange is that the juror knew some police officers, but not any who were close friends or relatives. King's argument that the juror was somehow evading the question, i.e., that she has police relatives, but not close friends, is again, attenuated. Simply stated, King has made neither a showing that the juror failed to honestly answer a material question nor that a correct answer would have provided the basis of a valid challenge for cause.

In sum, the record does not suggest that the judge at King's trial harbored actual bias against King or that the judge had an interest in the outcome of King's case. Nor does the record suggest that the jury at King's trial was not "willing to decide the case solely on the evidence before it." The

9

court of appeals' decision that King was not denied due process based on the bias of the trial court judge or jury was therefore not contrary to, nor did it involve an unreasonable application of, Federal law; nor was it based on an unreasonable determination of the facts. King is therefore not entitled to habeas relief based on his claim of judicial or jury bias at his trial.

## B. Prosecutorial Misconduct

King next points to a number of actions by the prosecutor at his trial that he claims demonstrate misconduct. First, King points out several inconsistencies between the prosecutor's opening statement, the testimony of different witnesses, and statements and records. King argues that these inconsistencies are the result of the prosecutor willfully making false statements, suborning perjury, and failing to correct false testimony once he learned that it was false. For example, according to King, the prosecutor stated in his opening statement that Police Officer Joan Mueller would testify that she visited the victim at her home, got a description of the suspect, and then broadcast the description to other police officers. However, in a police report written by another officer, Officer Paul Riehle, Officer Riehle stated that he had put the description out on the radio. (Pet'r's Br. at 14.)

Another example relates to the physical description that was given by the victim and broadcast over the police radio. The victim testified at trial that when the police conducted a showup with King, the victim was able to identify King as the person who robbed her because he was wearing the same clothes and had the same kind of "stockier build" as her assailant. However, when Officer Mueller testified, she stated that on the night of the crime the victim told her that the assailant was of "medium build" and weighed approximately 180 pounds. (Pet'r's Br. at 15-16.) Moreover, King states that Officer Riehle's report estimated the suspect's weight as about 200 pounds. (Pet'r's

10

Br. at 16.)  King argues that the prosecutor knew about these varying estimates and descriptions, yet when the victim's and Officer Mueller's testimony varied, the prosecutor did nothing to correct or bring to light the differences.  Thus, King argues, the prosecutor was implicit in and suborned perjury.

King gives other examples.  According to King, the prosecutor's description in his opening statement as to where King was found on the night in question diverges from the testimony at trial. Also according to King, Police Officer Pratt committed perjury by testifying that he could not recall if he found any contraband on King's person, and had not searched the surrounding area, when his police report indicates that he did not find contraband and did do a brief search.  (Pet'r's Br. at 17.) In the end, King points out many examples of possibly inconsistent information (not all of which are recounted here) in police reports, testimony at trial, and in both the prosecutor's opening and closing remarks to the jury.  King argues that all of the examples in aggregate demonstrate that the prosecutor knowingly and willfully put on evidence and made remarks that he knew were false.

King also maintains that the prosecutor committed misconduct by referring to "conviction" during cross examination of a defense witness and by stating that King is "now convicted" of the crime during his closing argument.  (Pet'r's Br. at 19, 21.)    Next, King contends that the prosecutor improperly vouched for his own witnesses and called defense witnesses "liars."  (Pet'r's Br. at 22-25.)

Finally, King argues that the prosecutor violated his Fifth Amendment right to not be a witness against himself by impermissibly commenting on King's silence in violation of *Griffin v. California*, 380 U.S. 609 (1965).  (Pet'r's Br. at 26.)

11

The United States Supreme Court has recognized that "prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). However, "to constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id*. (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

The Wisconsin Court of Appeals rejected King's arguments that he was denied due process based on prosecutorial misconduct. The court of appeals specifically rejected King's arguments that the prosecutor committed misconduct by misstating anticipated evidence during his opening statement and making improper comments during his closing argument. (Answer, Ex. D at 12.) Although it appears that King raised all of the same arguments in the court of appeals that he has raised here, the court of appeals did not go into detail regarding every alleged infraction by the prosecutor at trial. Finding that King's submission in that court to be "repetitive," and his arguments to be "often vague and underdeveloped," the court stated that, "[t]o the extent that we do not expressly address an argument in this opinion, it is rejected." (Answer, Ex. D at 9 n.5.)

I agree with the court of appeals that King has not demonstrated prosecutorial misconduct such that he did not receive a fair trial. King points to a number of instances where the prosecutor's opening remarks do not match the evidence introduced at trial, or where one piece of evidence introduced at trial does not match another piece of evidence or report. King would characterize such discrepancies as the prosecutor suborning perjury or failing to correct perjured testimony once it became known. However, none of the instances King points to suggest perjury on the part of the witnesses, much less that the prosecutor suborned perjury.

12

In one instance a police officer testified that he had not searched the area of the crime when a police report indicated that a brief search was done. In another instance the victim described King as having a "stockier build," while another witness stated that the victim initially reported her assailant to be of "medium build." There were also discrepancies regarding which police officer put out the assailant's description over the police radio and whether King was found standing behind a building or crouching down near an automobile. The long and short of it is that not all of the evidence agreed precisely in every detail. But this does not mean that the witnesses committed perjury or that the prosecutor knowingly made false remarks. Rather, it is not unexpected that one person's memory of specific details might diverge from another's, or that a person's own memory might not be perfect in every detail. In the end, nothing about the various discrepancies that King points out suggests that the prosecutor engaged in misconduct.

Furthermore, the fact that the prosecutor referred to "conviction" during cross-examination of a witness and in his closing remarks did not deprive King of a fair trial. There was nothing improper about the prosecutor asking King's mother about the consequences to her "[i]f Kenneth would be convicted in this case." (Tr. at 148.) That question went to possible bias. The prosecutor's closing remarks with which King takes issue are as follows: "I submit to you that the person charged with this crime, the person sitting in this courtroom, and the person charged and now convicted of that crime is Kenneth King." (Tr. at 175.) Whether the use of the term "now convicted" was a slip of the tongue or a choice of words by which the prosecutor was arguing that the evidence introduced did itself "convict" King is of no import. The jury knew that the decision of whether King was to be found guilty or not guilty rested with them. King was not deprived of due process by the prosecutor's use of the word "convicted."

13

Next is King's argument that the prosecutor impermissibly indirectly commented on King's silence in violation of his Fifth Amendments rights and *Griffin v. California*, 380 U.S. 609 (1965). The comments about which King complains were made during the prosecutor's closing remarks. In reference to King's counsel's argument that King was running because he was afraid of the police, the prosecutor stated, "[w]ell, frankly I'm offended by that, and I would ask you - - you heard no testimony of that, and you certainly have heard nothing that would indicate that Mr. King was afraid of the police on the night in question." (Tr. at 200.)

In *Griffin*, the Supreme Court held that the Fifth and Fourteenth Amendments forbid "either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin*, 380 U.S. at 615. However, the Court later clarified that "the protective shield of the Fifth Amendment should [not] be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case." *United States v. Robinson*, 485 U.S. 25, 32 (1988) (quoting *United States v. Hasting*, 461 U.S. 499, 515 (1983) (Stevens, J., concurring)). "Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated. But where . . . the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege." *Id.*

Here, even if the prosecutor's comments were directed toward King's silence (there was no direct reference to King's silence, but an indirect reference might be inferred), they were a fair response to a claim made by King's counsel. In his closing argument, King's attorney argued that King was running from the police because he feared police brutality. "Why did he try to elude the

14

police officer? Well, in this city, unfortunately, we've had a lot of problems with people getting shot by police officers. We've had police brutality in this city. Do you want police contact if you're a black male at midnight of July 30th of 2002? I wouldn't [want] it." (Tr. at 196.) The prosecutor responded to this argument by arguing that there was no evidence in the record that King was actually afraid. To be sure, the most likely source of such evidence, were it to exist, would be King himself. However, the prosecutor has a right to point out to the jury weaknesses in the defendant's defense, and in my opinion, the prosecutor's comments were a fair response to King's counsel's argument. The court of appeals decision, therefore, did not result in an unreasonable application of the relevant Supreme Court precedent in *Griffin* and *Robinson*.

Finally, there is King's allegation that the prosecutor improperly vouched for his own witnesses and called defense witnesses "liars." Generally, an attorney should not make arguments to the jury based on his own personal opinion or beliefs regarding the credibility of a witness or the culpability of a party. *United States v. Phillips*, 527 F.2d 1021, 1023-24 (7th Cir. 1975); *see also Berger v. United States*, 295 U.S. 78, 85-88 (1935). This is particularly true if the attorney "vouches for" a witness or suggests or insinuates that the attorney has personal knowledge relating to the credibility of a witness. *Id*. at 1024-25. However, it is permissible for an attorney to argue from the evidence as to why the jury might find a particular witness to be biased or not credible. *See id*.

In the case at hand, the prosecutor spent a fair amount of time presenting arguments as to why the prosecution's witnesses should be believed and the defendant's witnesses should not be believed. King faults several of the prosecutor's remarks. (Pet't's Br. at 24-25.) In most of the remarks about which King complains, the prosecutor was presenting argument as to why a witness was, or was not, credible. For example, with reference to King's alibi witnesses, the prosecutor stated, "[y]ou have

15

people up here lying on his behalf. They're his girlfriend. They're his mother. They're here to try to save him from what he's done, and what he's done is committed an armed robbery." (Tr. at 183.) Nothing about this remark, or others like it, suggests that the prosecutor was interjecting his personal beliefs into the proceedings or was personally vouching for his witnesses.

However, there were a couple of instances during his closing argument where the prosecutor used the words "I think" or "I know" in reference to issues before the jury. (*See, e.g.*, Tr. at 199, 201). In reference to where the allegedly stolen property was, the prosecutor stated, "I don't know where the property is. I know he [King] had it. I don't know what he did with it. It may be back at his residence." (Tr. at 201.) Moreover, at one point during his closing remarks, the prosecutor stated as follows: "I submit they're [King's alibi witnesses] not telling the truth. Whether he was home, I don't know. I certainly don't believe it was 10:42. I certainly don't believe that they're telling you the truth about their recollection because it's so inconsistent with what they said today, what they told Detective Becker, that it's a bunch of lies." (Tr. at 203.)

Had the prosecutor made these comments during a trial in this court, I may very well have sustained an objection to them. *See Phillips*, 527 F.2d at 1024. (holding that it is improper for a prosecutor to express his personal belief in the credibility of a witness "even if not phrased so as to suggest knowledge of additional evidence not known to the jury"). *But see United States v. Patterson*, 23 F.3d 1239, 1250 (7th Cir. 1994) (holding that in a particular context, a prosecutor's use of the phrase "I think" was not an interjection of personal opinion, but merely a comment on the inferences one could draw from the evidence); *United States v. Klein*, 817 F.2d 873, 876-77 (7th Cir. 1951) (similar holding regarding the phrase "I know").

16

Nevertheless, in Wisconsin courts the prosecutor seems to be afforded a bit more leeway. "In Wisconsin a prosecutor or a defense counsel may comment on the evidence, detail the evidence, argue from it to a conclusion and state that the evidence convinces him and should convince the jurors. However, when such an opinion is expressed it must be clear that it is based solely upon the evidence in the case." *Embry v. State*, 46 Wis. 2d 151, 160, 174 N.W.2d 521, 526 (Wis. 1970). The prosecutor is permitted to "say with the utmost freedom what the evidence tends to prove, and that it convinces him, and should convince the jurors as well, of the fact in issue." *Id*. at 161, 174 N.W.2d at 526. In other words, in this court a prosecutor might very well not be allowed to say that he or she did not personally believe a witness's testimony, or that he or she was personally convinced by the evidence in the case. In Wisconsin courts, however, prosecutors can say what they believe or are convinced of, as long as it is clear that their conclusions are drawn from the evidence at trial and not from some other source.

When taken in context, it is apparent that when the prosecutor in the case at hand made statements such as "I don't believe" the witness' testimony, or "I know he had it," the prosecutor was making arguments from the evidence introduced at trial. The statements were usually coupled with arguments from the evidence supporting such belief. The prosecutor did not insinuate that he had personal knowledge, outside of the evidence before the jury, that led to his conclusions. Nor did the prosecutor "vouch" for particular witnesses by, for example, stating that he personally knew them to be honest or trustworthy. It is not clear, therefore, that the prosecutor, who was proceeding in a Wisconsin state court, did anything that could be considered improper under the rules of that court.

In any event, and more to the point, even if the prosecutor did make improper comments, King's constitutional due process rights were violated only if such comments constituted misconduct

"of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987). In the case at hand, to the extent that the prosecutor did act improperly, it was of minor significance. If the prosecutor had stated, "I argue that" or some such phrase instead of "I don't believe," or if the prosecutor had stated "I submit that" instead of "I think," the meaning of his statements would have changed very little. The prosecutor did not interject his own credibility into the proceedings such that the jury's attention was turned from what the evidence demonstrated, nor did he insinuate that he had personal knowledge outside of the evidence introduced at trial.

Simply stated, in the context of all of his remarks, it is obvious that the prosecutor was presenting arguments to the jury based on the evidence introduced at trial, and was not appealing to the jury to decide the case on other grounds. The prosecutor's isolated remarks about his beliefs did not deprive King of a fair trial. *See Darden v. Wainwright*, 477 U.S. 168, 179 (1986) (reviewing the trial record as a whole and determining that although the prosecutor's closing argument contained many outrageous and inflammatory comments and "deserves the condemnation it has received from every court to review it," the defendant nevertheless was not deprived of a fair trial).

For all of the foregoing reasons, I cannot say that the prosecutor engaged in misconduct such that King was deprived due process. This is because most of the prosecutor's actions about which King complains were not improper, and even if the prosecutor did make some isolated improper comments, they did not deprive King of a fair trial. The court of appeals' decision, therefore, did not result in an unreasonable application of federal law as interpreted by the Supreme Court.

18

## C. Ineffective Assistance of Trial Counsel

King maintains that his trial counsel was ineffective for a number of reasons. First, King faults his attorney for not objecting to the actions of the trial court judge and prosecutor discussed above. Second, King maintains that his trial counsel was ineffective for not filing a pretrial motion challenging the victim's identification of King at a "showup" conducted on the night of the crime. Next, King claims that his counsel should have exerted more effort in meeting with and preparing his alibi witnesses for trial. Furthermore, King argues that his counsel should have introduced evidence at trial as to one of the alibi witnesses' (Helen King) profession. According to King, the fact that Helen King's professional duties included "note making and notetaking" would have bolstered her testimony at trial that she kept records as to King's comings and goings. (Pet'r's Br. at 32-33.)

King also claims his trial counsel was ineffective for not investigating information regarding the victim's credibility. For example, King maintains that his attorney should have checked with the victim's school or employer to see if the victim was leaving school or work on the night in question at the time that she claimed. (Pet'r's Br. at 34.) Furthermore, King faults his attorney for not obtaining records of the 911 call that was placed by the victim. King claims that the 911 records would have been important because they would have revealed the victim's initial description of her assailant and also would have had impeachment value. (Pet'r's Br. at 34.)

Next, King argues that his attorney was ineffective for not objecting to the prosecutor's use of certain physical evidence. Apparently, King planned to introduce items of clothing into evidence at trial to show that they were dissimilar to the clothes described by the victim. However, it appears that the prosecution ended up offering the clothing as evidence and asked the victim about it at trial.

19

King faults his attorney for not objecting to this course of conduct by the prosecutor as it "created the 'false impression' that this was the state's evidence." (Pet'r's Br. at 35.) King further faults his attorney for not cross-examining the victim about the description that she gave and not impeaching her with the descriptions contained in police reports. (Pet'r's Br. at 36.)

Furthermore, King maintains that his attorney was ineffective for not calling a witness after asserting in his opening statement that the witness would testify. King argues that his attorney asserted in his opening statement that Officer Riehle would testify, but did not call him as a witness, even though Officer Riehle's testimony was important because his report allegedly contradicted other evidence offered at trial. (Pet'r's Br. at 37.)

Finally, King faults his trial counsel for not filing a motion to dismiss after a witness (the victim of the crime) was not properly sworn in before giving testimony at the pre-trial hearing. King claims that the fact that there are two transcripts of the pre-trial hearing, one that indicates that the witness was sworn in, and one that does not, demonstrates that "someone in the Milwaukee County Court System has committed a crime" and in doing so violated King's due process rights. (Pet'r's Br. at 39.)

At the outset, King argues that the deferential standard of review set forth in 28 U.S.C. § 2254(d) should not be applied to his ineffective assistance of trial and appellate counsel claims. King argues that, although the Wisconsin Court of Appeals cited *Strickland v. Washington*, 466 U.S. 668 (1984), its opinion is devoid of inquiry into the sufficiency of his attorneys' actions/inaction and the prejudicial effect thereof. Therefore, according to King, the court of appeals did not decide his case "on the merits," and this court should apply the general standard of review set forth in 28 U.S.C. § 2243. (Pet'r's Br. at 27.)

20

King's assertion is incorrect. "[Title 28 U.S.C. § 2254(d)'s] requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court." *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005). Instead, for the purpose of determining whether § 2254(d)'s standard of review applies, a petitioner's claim is decided "on the merits" by the state court if the state court did <u>not</u> decide the claim on procedural grounds. *Id*. Here, the Wisconsin Court of Appeals did not decide King's ineffective assistance of counsel claims on procedural grounds. The deferential standard of review set forth in § 2254(d) is therefore the proper standard for this court to apply.

Defendants in criminal cases have a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to establish an ineffective assistance of counsel claim, a defendant must demonstrate both that counsel's assistance was ineffective, and that the ineffective assistance prejudiced the defendant. A defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

The burden on a habeas petitioner to show that counsel's assistance was ineffective is not easily satisfied. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689.

Case 2:05-cv-00928-WEC    Filed 06/02/06    Page 21 of 32    Document 21

The court of appeals correctly identified the *Strickland* standard as the guidepost by which to analyze King's ineffective assistance of trial counsel claim. (Answer, Ex. D at 9.) The court of appeals then went on to reject King's claim that he received ineffective assistance of trial counsel. In his brief in this court, King mixes his ineffective assistance of trial counsel claim with the other enumerated claims discussed above, and then presents additional arguments as to why his counsel was ineffective. I will start by noting that, to the extent which King's ineffective assistance of trial counsel claim is based on his lawyer's failure to object to, or make motions based on, the events underlying King's bias and misconduct claims, the court appeals' determination that King did not receive ineffective assistance of trial counsel was not unreasonable. For all of the reasons discussed above, had King's counsel made objections to, or filed motions relating to, his bias and misconduct claims, they would not have changed the outcome of his case. Therefore, King cannot meet the second prong of the *Strickland* test based on this ground.

King's next argument relates to his attorney's preparation of his alibi witnesses. Counsel was not deficient for not further preparing the alibi witnesses or asking Mrs. King about her note-taking duties. The fact that Mrs. King took notes at work would not likely make a jury believe that she recorded the times of her son's comings and goings if they did not take her word for it to begin with. Moreover, King has not shown a likelihood that the result of his case would have been different had his counsel dealt differently with the alibi witnesses. King has not demonstrated how the alibi witnesses' testimony would have been any different had counsel spent more time preparing them.

Counsel was also not deficient for not investigating the victim's claim that she was in school on the night in question. There was no particular reason to doubt the claim, and counsel cannot be expected to exhaustively investigate every non-material aspect of a case. Again, King has not

demonstrated a likelihood that the result of his case would have been different had his counsel investigated the victim's claims.

Furthermore, King has not rebutted the presumption that his counsel was acting reasonably when he did not obtain the 911 records. Even more importantly, there has been no showing that, had the attorney obtained the records, the case would have turned out differently. Simply stated, King has done little more than conjecture that *perhaps* the records might offer something with which to impeach the victim's testimony.

Next is King's argument that his attorney should have objected to the prosecutor's use of physical evidence. Whether or not King intended the evidence for a particular purpose, there has been no showing that the prosecutor's use of the evidence was improper. There is no reason to believe that the evidence would have been excluded had King's counsel objected to it. King therefore has failed to satisfy either prong of the *Strickland* test with regard to the physical evidence.

Next, counsel's cross-examination of the victim was not deficient. The transcript reveals that King's attorney questioned the victim about the lighting on the night in question, distances, and how much time she had to observe her assailant. He then attempted to impeach the victim regarding her testimony as to the order in which certain things occurred, and finally asked specific questions concerning a discrepancy between the victim's description of the assailant's clothing and the clothing in evidence. (Tr. at 79-87.) King apparently faults his attorney for not also "impeaching" the victim with her two statements, one stating the assailant was of a "stockier" build and the other of "medium" build, and the fact that she estimated her assailant to be 180 pounds while a police officer estimated King to be 200 pounds.

23

I cannot say that counsel's not pursuing such lines of questioning rebuts the presumption that he acted within the wide range of reasonable professional assistance. Simply stated, the estimates and descriptions given were very similar to one another. It is easy to see why counsel might want to avoid questioning the victim about these minor variations for fear that the jury would perceive it as badgering the victim. Moreover, there is no reason to believe that, had counsel pursued the questions, King's trial would have ended differently.

As for the argument that King's counsel should have made a motion to dismiss based on the victim's not being sworn in at the preliminary hearing, failing to make such a motion does not constitute ineffective assistance of counsel. The court of appeals held that any objection King might have made was waived. More importantly, there is no indication that the victim did not testify under oath at trial. I fail to see how the witness's not being sworn at the preliminary hearing prejudiced King in light of the fact that the witness did testify under oath at trial. Moreover, King's allegation that someone committed a crime, apparently by fraudulently inserting an oath into a transcript in a conspiracy against King, is without factual basis.

Next is King's claim that his attorney failed to call a witness whom he represented in his opening statement would testify. The witness was a police officer, so presumably King's attorney believed that the prosecution would call him. In any event, it is unlikely that the jury would hold against King the officer's failure to testify, even if his attorney said the officer would testify. Moreover, although King argues that the officer had important testimony to give, it appears that this important evidence is the officer's estimate of King's weight (30 pounds over King's actual weight) and the fact that he, instead of another officer, put King's description out over the police radio.

Case 2:05-cv-00928-WEC   Filed 06/02/06   Page 24 of 32   Document 21

Simply stated, there is nothing to suggest that, had the officer been called as a witness, King's trial would have ended differently.

Finally, there is King's argument that his counsel was deficient for failing to file a pretrial motion challenging the victim's identification of King at a "showup" conducted on the night of the crime. According to the evidence at trial, the victim was told by the police that they had found a man who matched the general description she had given, and in the general area of the robbery. The victim was then driven to where the defendant was and identified King as her assailant. King was standing next to a car, with police officers, but not in handcuffs. (Answer, Ex. D at 5.) The procedure used is referred to as a "showup," and not a "lineup," because there were no other individuals present for the victim to choose from at the time of her identification of King. The victim immediately identified King as her assailant from about 100 feet away, and then when brought closer stated that she was "100%" sure. (Answer, Ex. D at 5.)

The court of appeals held that King's counsel was not ineffective for not bringing a motion challenging the "showup" because such a motion would not have been successful. (Answer, Ex. D at 10.) The court cited then-valid Wisconsin case law for the proposition that a "showup" is not per se impermissibly suggestive, and then concluded that in King's case the show up was not impermissibly suggestive. (Answer, Ex. D at 10.)

The Wisconsin Supreme Court case on which the court of appeals relied was *State v. Wolverton*, 193 Wis. 2d 234, 533 N.W.2d 167 (Wis. 1995). The court in *Wolverton*, in turn, relied on United States Supreme Court cases concerning the requirements of due process in the context of out-of-court identifications. Among other cases, the court in *Wolverston* cited *Stovall v. Denno*, 388

25

U.S. 293 (1967), *Simmons v. United States*, 390 U.S. 377 (1968), and *Manson v. Brathwaite*, 432 U.S. 98 (1977).

In *Brathwaite*, the Supreme Court reaffirmed its earlier holding in *Neil v. Biggers*, 409 U.S. 188 (1972), that the "admission of evidence of a showup without more does not violate due process." *Brathwaite*, 432 U.S. at 106 (quoting *Biggers*, 409 U.S. at 198). Identification evidence that is derived from a process that is suggestive may nevertheless be admitted if the evidence is reliable. *Id*. at 114. In determining whether an identification is reliable, courts should consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id*.

In King's case, the court of appeals analyzed King's claim under Wisconsin precedent that was consistent with United States Supreme Court precedent. The court of appeals followed a two step analysis as set forth in *State v. Kaelin*, 196 Wis. 2d 1, 9, 538 N.W.2d 538, 540-41 (Wis. App. 1995). Under that test, the court first determines whether the identification procedure is characterized by unnecessary suggestiveness, and if so, whether the totality of the circumstances shows that the identification was reliable despite the unnecessary suggestiveness. *Id*. Finding that the procedure in King's case was not unnecessarily suggestive, the court of appeals did not proceed to consider the reliability of the victim's identification of King. (Answer, Ex. D at 10.)

I note that, if the court of appeals would have proceeded to the next step and determined whether the victim's identification of King was reliable, it would certainly have concluded that it was. The victim had ample opportunity to view her assailant at close range during the robbery; she

26

gave a description that was quite accurate, if not perfect in every detail; upon seeing King, she exhibited a high level of certainty that he was her assailant; and, she identified King within a very short time after the robbery. In short, the victim's identification of King had almost all of the indicia of reliability outlined by *Brathwaite*.

In light of all of this, I cannot say that the court of appeals' determination that King's counsel was not ineffective for failing to file a motion challenging the showup resulted in an unreasonable application of *Strickland*. Simply stated, based on the discussion set forth above, as the law stood at the time of King's case, such a motion would not have been successful. King therefore cannot show that, should his attorney have made such a motion, the result of his trial would have been different.

There has been a development in the law in Wisconsin with regard to showups since King's appeal was decided. The court of appeals decided King's case on March 11, 2005. On July 14, 2005, the Wisconsin Supreme Court decided *State v. Dubose*, 285 Wis.2d 143, 699 N.W.2d 582 (Wis. 2005). In *Dubose*, the Wisconsin Supreme Court held that a suggestive identification, even if "reliable" under the criteria of *Brathwaite*, would not be admissible unless the suggestive identification procedure was "necessary." *Dubose*, 285 Wis.2d at 165-66, 699 N.W.2d at 594. Although there is language in earlier decisions by the United States Supreme Court and by Wisconsin courts concerning identifications being "unnecessarily" suggestive, the *Dubose* court took a harder stance on when a showup is "necessary." The court grounded its holding in the Due Process Clause of Article I, Section 8 of the Wisconsin Constitution. *Id*. at 173, 699 N.W.2d at 597.

This development in Wisconsin law will not affect the outcome of King's federal habeas petition. Because *Dubose* was not decided until after King's appeal was decided, neither King's trial

27

attorney nor his appellate attorney can be found to be ineffective for not raising arguments based on it. Moreover, *Dubose* has no implication on King's rights under the United States Constitution. In that regard, I express no opinion as to whether King would have a claim based on *Dubose*, nor whether any avenue of relief might yet be open to him in the state courts. Suffice it to say, based on documents filed in this court, it appears that King has been made aware of the *Dubose* decision and that, at some point, a public defender was appointed to review King's case in light of *Dubose*. (*See* attachments to Pet'r's Mot. filed January 19, 2006.)

For all of the foregoing reasons, I cannot say that the court of appeals' determination that King did not receive ineffective assistance of counsel at trial resulted in an unreasonable determination of Supreme Court precedent. King has not overcome the presumption that his counsel's representation was within the range of reasonable professional assistance. Nor has he shown that, if his attorney would have done things differently, the outcome of his trial would have been different. In sum, King is not entitled to federal habeas relief based on ineffective assistance of trial counsel.

### D. Ineffective Assistance of Appellate Counsel

King argues that his appellate counsel was also ineffective. First, King contends that his appellate counsel refused to file a motion in the circuit court raising King's ineffective assistance of trial counsel claim. King argues that under Wisconsin law, the Wisconsin Court of Appeals cannot review an ineffective assistance of trial counsel claim unless an evidentiary hearing on the issue is conducted by the trial court. Therefore, King maintains, although the court of appeals did consider King's ineffective assistance of trial counsel claim, it should not have done so, and King's appellate counsel was ineffective for failing to bring the claim in the circuit court. (Pet'r's Br. at 28.)

28

King also faults his appellate counsel for filing an unauthorized motion in the circuit court, for not adequately reviewing the case record before filing his no merit brief in the appellate court, for failing to cite adequate legal authority for the sufficiency of the evidence issue raised in the no-merit brief, and for including language in a post-trial motion filed in the circuit court purportedly preserving the right to raise additional issues when he knew that this was not possible. (Pet'r's Br. at 41-46.)

The legal standard for evaluating King's ineffective assistance of appellate counsel claim is the *Strickland* standard. Although an ineffective assistance of appellate counsel claim is usually not raised in an initial appeal, King did raise the issue in his submissions before the court of appeals, and the court decided the claim. The court of appeals rejected King's claim that his appellate counsel was ineffective for not bringing a post-conviction motion in the trial court challenging the effectiveness of his trial counsel. The court of appeals held that "[b]ecause we conclude that trial counsel was not ineffective, that argument necessarily fails." (Answer, Ex. D at 9 n.6.) This was not an unreasonable application of *Strickland*. For all of the reasons discussed above regarding his ineffective assistance of trial counsel claim, even had King's appellate counsel brought a motion raising the claim, it would have failed. King therefore cannot show prejudice.

Furthermore, by accepting King's appellate counsel's no-merit brief, the court determined that the attorney was not ineffective. The court stated, "[t]his court has considered the no-merit report and King's responses, and we have independently reviewed the record. Because we conclude there are no arguably meritorious issues, we summarily affirm the judgment of conviction." (Answer, Ex. D at 2.)

29

Once again, King's argument that his appellate counsel was ineffective must fail because he cannot demonstrate prejudice. The court of appeals independently reviewed the record of King's case and determined that there were no meritorious issues. In other words, there were no issues that, even had King's appellate counsel raised them, would have caused the outcome of King's appeal to have been different. I cannot say this conclusion was unreasonable. King faults his appellate attorney on several grounds, but he has not pointed out any action or inaction by his attorney that, if done differently, would have led to a different result on appeal. For all of the reasons discussed above, none of the arguments that King raised in this court (i.e., the same arguments he raised independently in the court of appeals and wanted his appellate counsel to raise) would have changed the outcome of King's appeal. Thus, King is not entitled to federal habeas relief based on his claim of ineffective assistance of appellate counsel.

There is one final issue that must be addressed before concluding. On May 10, 2006, King filed a "Motion for Production of Discovery/Documentation." King seeks certain police reports, transcripts, the 911 records, and would like to have juror #2 answer an interrogatory. Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." However, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

In my opinion, King has not established good cause for seeking discovery. King seeks police reports and transcripts, apparently in furtherance of his claim that the police, the prosecutor, and others knowingly put on perjured testimony at trial or otherwise conspired against him. King also

30

seeks to present an interrogatory to a juror in furtherance of his claim that she knowingly withheld information during voir dire, even though the transcript of voir dire suggests no such thing. In short, King seeks information to support claims that border on frivolous. Moreover, King's discovery motion was not filed until well after the parties had fully briefed the issues in this case. For all of these reasons, King's motion for discovery will be denied.

## V. CONCLUSION AND ORDERS

In conclusion, and for all of the foregoing reasons, King has failed to demonstrate that the court of appeals' decision affirming his conviction resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). King is therefore not entitled to federal habeas relief. As a result, King's petition for a writ of habeas corpus will be denied and this action will be dismissed.

**NOW THEREFORE IT IS ORDERED** that the petitioner's "Motion for Production of Discovery/Documentation" be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that the King's petition for a writ of habeas corpus be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.

31

**SO ORDERED** this <u>2nd</u> day of June 2006, at Milwaukee, Wisconsin.


<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

Case 2:05-cv-00928-WEC   Filed 06/02/06   Page 32 of 32   Document 21